525 A.2d 857

Edward J. Marshall *v.* Port Authority of Allegheny County and Michael Baker, Jr., Inc. Port Authority of Allegheny County, Appellant.

Edward J. Marshall *v.* Port Authority of Allegheny County and Michael Baker, Jr., Inc. Michael Baker, Jr., Inc., Appellant.

132

Argued March 23, 1987, before Judges CRAIG and DOYLE, and Senior Judge NARICK, sitting as a panel of three.

*Louis C. Long,* with him, *Raymond H. Conaway, Meyer, Darragh, Buckler, Bebenek & Eck,* for appellant, Port Authority of Allegheny County.

*W. Arch Irvin, Jr., Wayman, Irvin & McAuley,* for appellant, Michael Baker, Jr., Inc.

*Edward J. Balzarini, Balzarini, Carey & Watson,* for appellee, Edward J. Marshall.

Opinion by Judge Craig, May 13, 1987:

The Port Authority of Allegheny County (PAT) and Michael Baker, Jr., Inc. appeal from a judgment entered in favor of Edward J. Marshall to compensate him for injuries he sustained while demolishing a bridge in a PAT construction project.

Mr. Marshall's complaint avers that he was employed as a laborer by the Mosites Construction Company in the construction of the PAT East Busway. Mr. Marshall testified that on January 13, 1981, at approximately 7:00 p.m., he stepped onto a steel beam on a bridge which was being dismantled. Workers had cut the beam earlier with an acetylene torch; when he placed his weight on it, the beam gave way and Mr. Marshall fell 15 to 20 feet to the ground below. Immediately after his fall, a steel beam landed on top of Mr. Marshall's legs, inflicting severe injuries.

Mr. Marshall filed suit against Michael Baker, Jr., Inc., an engineering firm retained by PAT for the construction project, and PAT. A jury determined that Baker had been negligent and that PAT was vicariously liable for the negligence of the Mosites Construction Company, the general contractor. After denying the defendants' motions for post-trial relief, Judge Farino of the Allegheny County Court of Common Pleas entered judgment holding PAT and Baker jointly and severally liable for Mr. Marshall's damages. Baker appealed the judgment to the Superior Court which transferred the case to this court to be consolidated with an appeal filed by PAT.

## Port Authority Appeal

PAT contends that it is immune from liability in this case under section 8541 of the Judicial Code, 42 Pa. C. S. §8541, the local agency immunity statute known as

the Political Subdivision Tort Claims Act. That section provides:

> Governmental Immunity Generally
>
> Except as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person.

The parties dispute whether PAT is a "local agency" for purposes of the Political Subdivision Tort Claims Act.[1] This court recently resolved a similar question in *E-Z Parks, Inc. v. Larson*, 91 Pa. Commonwealth Ct. 600, 498 A.2d 1364, *aff'd per curiam*, 509 Pa. 496, 503 A.2d 931 (1986), in which we held that the Philadelphia Parking Authority was a "local agency" under the immunity statute. Examination of the parking authority's enabling legislation, which created "a public body corporate and politic, exercising the public powers of the Commonwealth as an agency thereof," led this court to conclude that the authority fit squarely within the definition of "local agency" found in section 8501 of the Judicial Code, 42 Pa. C. S. §8501.

---

[1] PAT, in a supplemental brief, alternatively contends that it is a Commonwealth agency in the wake of the Pennsylvania Supreme Court's ruling in *Feingold v. Southeastern Pennsylvania Transportation Authority*, 512 Pa. 567, 517 A.2d 1270 (1986).

Both SEPTA and PAT are established to exercise "the public powers of the Commonwealth" as an agency or instrumentality thereof. The Superior Court has noted, however, that the use of such terminology in municipal authority enabling statutes is of little value in determining whether a particular entity is cloaked with sovereign immunity. The legislature, in declaring such authorities to be "agencies" of the Commonwealth, often does so for tax and debt limitation reasons. *See Greer v. Metropolitan Hospital*, 235 Pa. Superior Ct. 266, 276-77, n. 36, 341 A.2d 520, 524-25, n. 36 (1975).

*Feingold* does not control our analysis because SEPTA, unlike PAT, exists under the Pennsylvania Urban Mass Transportation

PAT's genesis lies in section 3(a) of the Second Class County Port Authority Act, 55 P.S. §553(a),[2] which provides that:

There are hereby created bodies corporate and politic in counties of the second class, to be known as Port Authority of (insert name of county), which shall constitute public bodies corporate and politic; exercising the public powers of the Commonwealth as an agency thereof.

The Judicial Code broadly defines "local agency" as "[a] government unit other than the Commonwealth government." 42 Pa. C. S. §8501. As in our *E-Z Parks* analysis, we observe that PAT—as a public body corporate and politic—fits squarely within the Act's definition of "local agency."[3] *See also Rhoads v. Lancaster Parking*

Law, 55 P.S. §§600.101-600.407, providing that SEPTA "shall in no way be deemed . . . an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function. . . ." 55 P.S. §600.303(a).

PAT, as a creation of the Second Class County Port Authority Act, 55 P.S. §§551-563.4, is an instrumentality of Allegheny County and, therefore, not a Commonwealth agency for sovereign immunity purposes.

[2] *Act of April 6, 1956, P.L. (1955) 1414, as amended.*

[3] Courts have held that other local authorities are "local agencies" under the immunity statute: (County prison board and board of commissioners) *Damron v. Smith,* 616 F. Supp. 424 (E.D. Pa. 1985); (school district) *Auerbach v. Council Rock School District,* 74 Pa. Commonwealth Ct. 507, 459 A.2d 1376 (1983); (county-operated rehabilitation center) *Morris v. Montgomery County Geriatric Center,* 74 Pa. Commonwealth Ct. 363, 459 A.2d 919 (1983). *See also Amram Enterprises v. Port Authority of Allegheny County,* 93 Pa. Commonwealth Ct. 201, 501 A.2d 315 (1985) (Port Authority is a local agency under the Local Agency Law, 2 Pa. C. S. §101); *Graffigna v. City of Philadelphia,* 98 Pa. Commonwealth Ct. 624, 512 A.2d 91 (1986) (Southeastern Pennsylvania Transportation Authority is a local agency entitled to six months' notice of suit for personal injuries under 42 Pa. C. S. §5522); *cf.* footnote No. 2.

Authority, Pa. Commonwealth Ct. , 520 A.2d 122 (1987). We conclude, therefore, that the liability Mr. Marshall seeks to impose on PAT is subject to the local immunity statute.[4]

The parties next dispute the applicability of that act's "real property" exception to this case. Section 8542(b) provides:

> **(9) Acts which may impose liability.**—The following acts by a local agency or any of its employees may result in the imposition of liability on a local agency:
>
> . . . .
>
> (3) *Real Property.*—The care, custody or control of real property in the possession of the local agency, except that the local agency shall not be liable for damages on account of any injury sustained by a person intentionally trespassing on real property in the possession of the local agency. As used in this paragraph, 'real property' shall not include:
>
> (i) trees, traffic signs, lights and other traffic controls, street lights and street lighting systems;

---

[4] Mr. Marshall contends that PAT is barred under Pa. R.C.P. No. 1030 from asserting the tort immunity defense because it did not affirmatively plead that defense in its original answer to the complaint and assertion of new matters. However, the record reveals that the court granted leave to PAT, four months after it filed its original response, to amend its response. In its amended response, PAT claims immunity as an agency of the Commonwealth and cites government immunity statutes generally. Although PAT's pleading is imprecise, it was sufficient to place the parties on notice of the issue of tort immunity. We will not, therefore, prevent PAT from raising the tort immunity issue on appeal for failure to specifically plead immunity as a "local agency" under the local agency immunity statute.

(ii) facilities of steam, sewer, water, gas and electric systems owned by the local agency and located within right-of-way;

(iii) streets; or

(iv) sidewalks.

Mr. Marshall contends that, because PAT possessed the bridge and exerted control over it, the above-quoted real property exception subjects PAT to liability for all injuries occurring on the bridge or as a result of its demolition.

The trial judge instructed the jury on two theories by which PAT could be held liable for Mr. Marshall's injuries: (1) PAT was negligent; (2) the general contractor was negligent and PAT is vicariously liable as one who employed a contractor engaged in inherently dangerous work.[5]

---

[5] The vicarious liability theory under which Mr. Marshall seeks to hold PAT liable is described in sections 416 and 427 of the Restatement (Second) of Torts:

§416. Work Dangerous in Absence of Special Precautions. One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

§427. Negligence as to Danger Inherent in the Work. One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against danger.

See Philadelphia Electric Co. v. James Julian, Inc., 425 Pa. 217, 28 A.2d 669 (1967); McDonough v. United States Steel Corp., 228 Pa. Superior Ct. 268, 228 A.2d 542 (1974).

138

The jury specifically found that PAT was *not* negligent but that, because the contractor was engaged in inherently dangerous work, PAT was vicariously liable as the party who retained the contractor. Accordingly, we must proceed on the basis that, even though the bridge may be regarded as being in PAT's possession, no act of PAT consisting of the "care, custody or control" of the bridge caused the injury. The jury rested PAT's liability on its status as a contracting party, not on its status as a possessor of land. Therefore we conclude that the "real property" exception does not apply to this case.[6]

Because we have determined that PAT is a local agency protected under the local immunity act and that the real property exception to that act does not apply to the liability Mr. Marshall seeks to impose, we reverse the judgment entered in the Court of Common Pleas of Allegheny County as it applies to PAT.

### Baker Appeal

Mr. Marshall's complaint averred that Baker negligently supervised the contractor's demolition of the bridge. The basic elements of a cause of action founded on negligence are: duty, breach of duty, causal relationship between breach and resulting injury, and actual loss or damage. *Casey v. Geiger*, 346 Pa. Superior Ct. 279, 499 A.2d 606 (1985). A negligence claim cannot, however, be maintained upon facts as to which the law does not impose a duty. *Williams By and Through*

---

[6] Baker contends that the "streets" exception to PAT's tort immunity, found at 42 Pa. C. S. §8542(b)(6), also applies. That exception, however, requires that the plaintiff establish that the local agency had "notice" of a "dangerous condition." Consequently, because the jury made no findings as to PAT's notice of any dangerous conditions, the "streets" exception does not apply.

*Williams v. Lewis*, 319 Pa. Superior Ct. 552, 466 A.2d 682 (1983).

Duty, in any given situation, is predicated on the relationship existing between the parties at the relevant time. *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983); *Dumanski v. City of Erie*, 348 Pa. 505, 34 A.2d 508 (1943). To understand the relationship between Baker, PAT and Mosites in the East Busway project, we look to the PAT-Baker contract and Baker's actual performance.

Baker argues that it was never obligated, under contract or in actual practice, to control the manner in which Mosites performed its work and therefore owed no duty to PAT or Mr. Marshall upon which a finding of negligence could be based.

The jury returned only a general finding of negligence against Baker. In his brief, however, Mr. Marshall offers five specific duties which, he contends, Baker owed and breached relating to the East Busway construction project.

First, Mr. Marshall contends that the jury could have reasonably found that Baker was negligent in approving and permitting the performance of ultrahazardous demolition work at night under unsafe conditions. The premise to that contention is that Baker was responsible for reviewing, with the authority to veto, working conditions proposed by Mosites.

We note that, under the original PAT-Baker contract, Baker specifically assumed the duty of "[r]eviewing contractors' practices and procedures to minimize hazards associated with construction operations." However, in supplemental PAT-Baker agreements, the parties eliminated Baker's safety review duty.[7] Therefore,

---

[7] Section 1(b) of Supplemental Agreement No. 4 eliminates Baker's construction management duties assigned in the original agreement and provides that PAT shall assign these duties at its discretion.

even though Mr. James T. Neill, a Mosites project superintendent, testified that he "had to clear" Mosites' addition of a nighttime work shift with Baker as well as PAT (N.T. 686-87), there is no evidence that Baker was responsible for assuring safe work conditions.

Mr. Marshall contends that section GP 4.11.5 of the PAT-Mosites contract creates an affirmative duty on Baker to halt construction (or demolition) if the contractor adopts hazardous work procedures. That section provides:

Failure of the Contractor to comply with any of the requirements of Article GP 4.11 [specifying safety standards] may be cause for the Authority to disqualify the Contractor from bidding on Authority work other than that encompassed by this Contract. In addition, should such failure create a hazard to life, limb or property, the Engineer may stop any operation of the Contractor affected by the failure until the failure is remedied.

The PAT-Mosites contract, however, cannot legally bind persons who are not parties to that contract. *Chambers Development Co., Inc. v. Allegheny County Health Department,* 81 Pa. Commonwealth Ct. 622, 474 A.2d 728 (1984). Although the quoted provision subjects Mosites to "the Engineer's" authority to halt construction, it does not bestow any duty on Baker, who was not a party to the contract, to monitor Mosites' section GP 4.11 compliance.

Second, Mr. Marshall contends that the jury could have reasonably found that Baker was negligent in permitting demolition work to proceed without requiring a demolition plan from Mosites. At trial, Mr. Marshall's attorneys established that Baker had required Mosites to submit a detailed demolition plan for another bridge (the South Avenue Bridge) in the same project. A cross-

examination of Mr. Hardy, PAT's Director of Engineering and Construction, revealed, however, that the demolition of the South Avenue bridge involved the use of explosives. Mr. Hardy testified that, under the terms of the PAT-Mosites contract, PAT specifically required Mosites to seek previous written approval for demolition if the demolition involved the use of explosives[8] (N.T. 63). Our review of the construction contracts reveals that Baker did not have to require or review demolition plans for the Penn Avenue bridge, from which Mr. Marshall fell, because that demolition did not involve the use of explosives.

Third, Mr. Marshall contends that the jury's verdict could be based on Baker's allegedly negligent investigation and recommendation of an unqualified contractor to perform the demolition work. Once again, however, nothing in the original PAT-Baker agreement, or supplemental agreements, imposes a duty on Baker to screen contractors for the EB-10 contract.[9] Furthermore, although Mr. Hardy testified that Baker participated in the decision to award the contract to Mosites (N.T. 24-

---

[8] GP 4.15 of the PAT-Mosites contract provides:
*USE OF EXPLOSIVES*

GP 4.15.1   The use of explosives will not be permitted without the prior written approval of the Authority. Such approval will not be given until the Contractor has fully satisfied the Authority that all clearances have been obtained and that all public and private utility owners and property owners having structures near the site of the Work have been notified of the Contractor's intention to use explosives. However, such approval by the Authority and such notices will not relieve the Contractor of his responsibility for any damage resulting from his blasting operations.

[9] The EB-10 contract is PAT's designation for the portion of East Busway construction awarded to Mosites.

25), the record does not contain any evidence that Mosites was unqualified to demolish the bridge.[10]

Fourth, Mr. Marshall contends that Baker's contract obligated it to require a written safety program from Mosites which it never obtained. However, the record does not contain any evidence to support Mr. Marshall's contention. To the contrary, the record contains the testimony of Raymond Budnick, a Baker employer, who identified Defendant's Exhibit E, which is a written safety program submitted by Mosites to Baker in a pre-construction meeting in November, 1980. (N.T. 1241, 1268-71.)

Fifth, Mr. Marshall contends that Baker breached its contractual obligation to provide on-site inspectors to insure that construction, or in this case demolition, proceeded according to contract specifications. Mosites' contract specifications incorporate by reference safety standards established in the Williams-Steiger Occupational Safety and Health Act of 1970 (OSHA).[11] Mr. Marshall alleges further that the nighttime demolition activity violated OSHA standards.

Section B(1) of the "Scope of Services" appendix to supplemental agreement No. 6 between PAT and Baker states that Baker shall:

Provide field engineers, inspectors, and support personnel to monitor the construction performed under Authority issued contracts, to assure delivery of the specified systems and facilities in

---

[10] The record contains PAT exhibit A which is a statement of Mosites' construction experience before the busway project. That statement lists nine major construction projects in which Mosites was involved between 1976 and 1980. The statement reveals that Mosites had 19 years' experience as a prime general contractor at the time that it bid on EB-10.

[11] 29 U.S.C. §§651-678.

accordance with contract drawings and specifications.

Section B(1) is ambiguous because it appears to require Baker to monitor construction *methods* with an eye toward the OSHA-incorporated contract specifications. Yet Baker's oversight is required only "to assure delivery" of the finished product "in accordance with contract drawings and specifications." When contract language is ambiguous, we must examine extrinsic evidence to derive the parties' intent. *Pennsylvania Department of Transportation v. Bracken Construction Co.,* 72 Pa. Commonwealth Ct. 620, 457 A.2d 995 (1983).

We note section GP 6.4 of the PAT-Mosites contract. That section provides:

### SUPERVISION OF CONSTRUCTION

GP 6.4.1 The Contractor shall supervise and direct the Work, using his best skill and attention. He shall be *solely responsible* for all construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract. (Emphasis added.)

When these two contract provisions, describing the working relationship between Baker and Mosites, are read together, Baker's inspection duties appear to be limited to assuring that the project conforms to design specifications. To impose a duty on Baker to inspect demolition procedures for safety compliance would conflict with the sole responsibility granted to Mosites for its "construction means, methods, and techniques" under section GP 6.4.1. We conclude therefore that PAT delegated sole legal responsibility for OSHA compliance to Mosites. Consequently, Baker's inspection activities, or lack thereof, are immaterial to Mosites' OSHA compliance.

Because Mr. Marshall has been unable to identify any legal basis for the duties which he alleges that Baker breached, we must conclude that Mr. Marshall has not established a cause of action in negligence, and that the trial judge erred, as a matter of law, in denying Baker's motion for judgment notwithstanding the verdict.

Accordingly, judgment entered against PAT and Baker is reversed.

### ORDER IN 1708 C.D. 1986

Now, May 13, 1987, the judgment entered in favor of Edward J. Marshall, against the Port Authority of Allegheny County and Michael Baker, Jr., Inc., by the Court of Common Pleas of Allegheny County, G.D. 82-23771, is reversed.

### ORDER IN 51 T.D. 1986

Now, May 13, 1987, the judgment entered in favor of Edward J. Marshall, against the Port Authority of Allegheny County and Michael Baker, Jr., Inc., by the Court of Common Pleas of Allegheny County, G.D. 82-23771, is reversed.